# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00163-CV

---

**M. P. a/k/a M. D.; J. J. L.-B. and C. J. L., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 261ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-20-003397, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

M.P. a/k/a M.D. (Mother) and J.J.L.-B. and C.J.L. (Foster Parents) appeal from the trial court's final decree of termination and orders for conservatorship, possession, and access.[1] Following a bench trial, the trial court terminated Mother's parental rights to M.A.P. (Child) and appointed the Texas Department of Family and Protective Services as the nonparent permanent managing conservator of Child; M.P., Sr. (Father) as parent possessory conservator; and Foster Parents as nonparent possessory conservators. In her appellate issue, Mother argues that the trial court did not have jurisdiction to render a final order. In their two appellate issues, Foster Parents challenge the legal and factual sufficiency of the evidence to support the trial court's predicate-ground and best-interest findings as to Father. *See* Tex. Fam. Code

---

[1] We refer to the foster parents by their initials or as Foster Parents and the parents and their child by their initials or as Father, Mother, and Child. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. Father has not appealed from the final decree.

§ 161.001(b)(1)(O), (2). For the following reasons, we affirm the final decree of termination and orders for conservatorship, possession, and access.

## BACKGROUND

Mother and Father married in 2006, and Mother's six-year-old son from a previous relationship lived with them. Mother and Father separated in 2019 but began living together again in the spring of 2020 when Mother was pregnant with Child. During her pregnancy, Mother did not obtain prenatal care. In June 2020, Mother's water broke, and Mother and Father went to the hospital but left shortly afterward against medical advice. After Mother was unresponsive during an exam, hospital staff searched her gown suspecting drug use. Mother and Father left after Mother was searched and a dark tar-like substance was found in her gown.[2] Mother, her son, and Father then stayed in a hotel. While they were at the hotel, the police and the Department conducted welfare checks on Mother. After about one week, EMS transported Mother to a hospital where she gave birth to Child, who was born premature, tested positive for opiates, showed symptoms of drug withdrawal, and was admitted to the NICU for treatment of drug withdrawal, where he remained for two months. Mother also tested positive for amphetamine, opiates, "benzos," and THC and admitted that she used illegal drugs including heroin while she was pregnant with Child.

Shortly after Child was born, the Department filed an original petition concerning Child and sought emergency relief. The trial court appointed the Department as Child's temporary managing conservator and removed Child from the parents' care. The Department

---

[2] Conflicting evidence was presented at trial as to what substance was found on Mother. Evidence supported that it was heroin, but Father testified that it was not "black tar heroin" but a "COVID test paper that they had provided for [Mother]."

2

identified Foster Parents as a possible placement, and they began visiting and training to care for Child when he was in the NICU. Child was discharged from the hospital to Foster Parents, who continued to care for Child during the case. In a separate suit, Foster Parents filed a petition for termination of parental rights and adoption. The trial court consolidated their case with the Department's case prior to the bench trial.

The bench trial occurred in December 2021 when Child was around seventeen months old. Mother was represented by counsel, but she personally attended only portions of the trial. Father was present and acted pro se with the assistance of a court-appointed advisory attorney. The witnesses at trial included Father, Mother, police officers, nurses who provided medical care to Mother and Child, Department caseworkers and investigators, and Foster Parents. The Department's reasons for seeking to terminate parental rights included its continued concerns with Mother's drug addiction, her use of heroin when pregnant and during the case, Father's unwillingness to engage in services, and his perceived lack of protectiveness of Child when Mother was pregnant and in labor.

Father testified that he lacked experience with "severe drug addiction" and "sick, pregnant women" and that his "actions were [his] only options." He testified that he and Mother separated in 2019 because of Mother's drug addiction, explaining that his concern with Mother being "impaired" began a "few months" before they separated and that it was "a tough decision to make, to leave [his] wife of 15 years because she's sick." After he found out in the spring of 2020 that Mother was pregnant, they began living together again. He did not believe that Child "would be here had [Mother] not come back to [him] because she was not taking care of herself." He wanted to "ensure that [Child] came into the world so [he] did everything [he] could to make that happen" and "the only way [he] knew how" to do that was "through the body of [Mother]."

3

He explained, "[T]he baby, of course, was very important. But if the mother doesn't live neither does the baby so [he] had to make sure [Mother] was healthy and strong, to the best of [his] ability." He testified that after they began living together again until Child was born, he "took [Mother] to [outpatient] rehab"[3] and he "cooked for her every day, three meals a day, good nurturing food." As to their decision to leave the hospital when Mother was in labor, Father testified that he did not think that it was dangerous to Child because a nurse said that Child was "healthy and fine" and "medical people" told him that "there was no danger."

Concerning his living situation and plans, Father testified that he was employed on a full-time basis as a maintenance technician at a hotel, that he had a "big family" with "lots of places [he could] stay," and that his plan if Child was returned to him was for Mother to visit with Child if she was sober but not to live with them. Father testified that he did not participate in court ordered services because he thought that the orders were unconstitutional after he received a "vindication" letter from the Department that "officially cleared [him] of any wrongdoing."[4] Father also testified that he did not visit with Child from January to June or July 2021 because he could not deal with the caseworker and "had to step back" from the Department's "bullying."[5] When asked to explain why the court should feel comfortable returning Child to him, Father responded that he was the "non-offending parent," would be an "excellent father" to Child, and did a "good job" raising his stepson, who was "21 now."

---

[3] Father testified that he "[could not] say for sure that [Mother] worked the program, but [he] walked her inside and [he] made sure she went."

[4] A Department investigator testified that Father was "ruled out" for abuse or neglect because he had not been the Child's caregiver. After Child was born and discharged from the hospital, the Child lived with Foster Parents.

[5] The Department caseworker from July to October 2020 testified that Father was "nurturing and caring" during his visits with Child.

4

Mother testified that she and Father met and began living together in 2004 and "didn't really bounce around" and that Father was "very good at keeping—maintaining a home for us" and provided a "stable place" to take care of her son. She also testified that she had separated from Father "off and on" because of differences that they had, including their age and kinds of friends. She explained that "[her] friends were still drinking and partying and stuff" and that "he didn't like to be around that kind of environment." Mother admitted to using heroin when pregnant and to using other illegal drugs and testified that she last used heroin about four months before trial but denied using drugs at their house when she and Father were living together, explaining that Father "kept an eye on [her] very well." She testified that Father liked to smoke marijuana but did not do it with her. Mother further testified that after they got back together when she was pregnant, Father took care of her, she went to rehab, and her son also was living with them. When asked about leaving the hospital when she was in labor, Mother testified that she "was told [that Child] was fine" and "that there was no urgency for him to be delivered that day."

Concerning her living situation and plans, Mother testified that she was employed and that if Child was returned to her, Child could live with her in a trailer. Mother, however, did not comply with court-ordered services, including drug testing. She did not drug test after September 2020, and she was arrested in December 2020 for burglary and possession of a controlled substance and in March 2021 for theft at a Walmart. The police officer who arrested Mother in December 2020 testified that they found drug paraphernalia, heroin, and methamphetamine in her backpack. The officer who arrested and searched Mother in March 2021 testified that he found the following items on Mother: stolen merchandise, a glass

5

pipe, a black-tar substance that was confirmed to be heroin, and pills that were confirmed to be methamphetamine.

The Department's representative, the attorney ad litem, and Foster Parents testified that terminating parental rights was in Child's best interest so that Foster Parents could adopt Child. The evidence showed that Foster Parents loved, were bonded with, were taking good care of, and hoped to adopt Child and that they had ensured that Child was receiving the extensive medical care and therapies that he needed. Foster Parents, however, were willing to have a conservatorship relationship with Child in their home if parental rights were not terminated.

In its final decree and orders for conservatorship, possession, and access, the trial court terminated Mother's parental rights, finding that she knowingly placed or knowingly allowed Child to remain in conditions or surroundings which endangered Child's physical or emotional well-being, engaged in conduct or knowingly placed Child with persons who engaged in conduct which endangered Child's physical or emotional well-being, and failed to comply with court-ordered services, and that it was in Child's best interest for Mother's rights to be terminated. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2). The trial court did not terminate Father's parental rights or make predicate ground or best interest findings against him. The trial court, however, found that the appointment of Father as Child's permanent managing conservator would not be in Child's best interest "because the appointment would significantly impair the child's physical health or emotional development." *See id.* § 153.131(a) (stating that parent "shall be appointed" managing conservator of their child "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development").

6

The trial court appointed the Department as Child's nonparent permanent managing conservator and appointed Father and Foster Parents as possessory conservators. The trial court also ordered that Father had the right to two hours of supervised visits weekly, *see id.* § 153.193 (allowing restrictions on parent's possession and access that do not "exceed those that are required to protect the best interest of the child"), with the possibility of expanding visits with the "agreement of the child advocates." Mother's and Foster Parents' appeals followed.

## ANALYSIS

**Mother's Appeal**

In her appellate issue, Mother argues that the trial court lost subject matter jurisdiction to render a final order because it did not make the required findings under subsection 263.401(b) of the Family Code until after the initial dismissal date of June 28, 2021.[6] *See* Tex. Fam. Code § 263.401.

Subsection 263.401(a) of the Texas Family Code provides for the automatic dismissal of a suit filed by the Department requesting termination or conservatorship unless the trial court has commenced the trial on the merits or granted an extension "on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator." *Id.* § 263.401(a). The statute allows one extension that does not exceed 180 days from the one-year dismissal date if the trial court finds that "extraordinary circumstances necessitate the child remaining in the temporary managing

---

[6] After the initial dismissal date had passed, Mother filed a motion to dismiss that the trial court denied. Mother then raised the issue that she raises here in a petition for writ of mandamus, which this Court denied. *See In re Page*, No. 03-21-00456-CV, 2021 Tex. App. LEXIS 8419, at *1 (Tex. App.—Austin Oct. 19, 2021, orig. proceeding) (mem. op.).

conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b).

The case was set for jury trial the week of May 17, 2021, but Father objected to a Zoom videoconference jury trial and filed a motion for continuance and request that the court extend the dismissal deadline pursuant to the Texas Supreme Court's emergency orders regarding the COVID-19 State of Disaster. *See Thirty-Sixth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 897 (Tex. 2021) (effective March 5, 2021); *C.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00587-CV, 2022 Tex. App. LEXIS 2477, *7, n.2 (Tex. App.—Austin Apr. 15, 2022, no pet.) (mem. op.) (listing Texas Supreme Court's emergency orders regarding COVID-19 State of Disaster). The case was reset for jury trial the week of June 21, 2021.

During a permanency review hearing on June 15, 2021, that was held via videoconferencing, the trial court orally extended the dismissal date at the Department's request and set a new dismissal date of December 27, 2021. Although the case was set for jury trial the following week, it appeared that it would not be reached. The trial court advised the parties that it had reviewed the court report in advance of the hearing; understood that the permanency plan remained unrelated adoption and that the parents were not "currently engaged in services"; informed the parties that it was extending the dismissal deadline; found that "there are extraordinary circumstances that necessitate an extension of the dismissal deadline in this case," *see In re G.X.H.*, 627 S.W.3d 288, 299 (Tex. 2021) (observing that trial court may make section 263.401 findings orally in presence of court reporter (citing Tex. Fam. Code § 101.026)); and set the new dismissal date of December 27, 2021. Mother was not present for the June 15 hearing, but her attorney participated in the hearing and did not object to the extension. The attorney

8

represented to the trial court that Mother reported that she had "begun drug treatment" and had "a family member that she would like to have looked at as a possible placement." Although the trial court extended the June 28 dismissal deadline to December 27, it did not continue the trial setting. The parties received notice the following Monday, June 21, that they could proceed to jury trial that week, but Mother's counsel asked for the trial to be reset.

On July 16, the trial court signed an order reflecting its ruling from the June 15 hearing to extend the dismissal deadline. In its order, the trial court ordered the dismissal date to be December 27, set dates for the final hearing on the merits, and expressly made section 263.401(b) findings:

> This Court finds that extraordinary circumstances necessitate the subject child, [Child], remaining in the Temporary Managing Conservatorship of the Department and that continuing the appointment of the Department as Temporary Managing Conservator is in the best interest of the subject child.

See Tex. Fam. Code § 263.401(b).

Mother argues that the trial court automatically lost jurisdiction because it did not make a best interest finding pursuant to subsection 263.401(b) prior to the June 28 dismissal date and that its finding in the July order was too late to extend the dismissal deadline. Mother, however, does not dispute that the trial court granted an extension prior to the initial dismissal date. See id. § 263.401(a); In re G.X.H., 627 S.W.3d at 301 (concluding that "while a trial court's failure to timely extend the automatic dismissal date before that date passes—through a docket-sheet notation or otherwise—is jurisdictional, claimed defects relating to the other requirements of 263.401(b) are not," and relying on trial court's docket entry that "agreed continuance" and "extension granted" before dismissal date to conclude that trial court did not automatically lose jurisdiction even though it did not expressly make section 263.401(b) findings

9

prior to dismissal date). Mother did not raise her complaint about the lack of a best interest finding until after the initial dismissal date had passed, and a jury trial could have commenced before the initial dismissal date but was reset based on Mother's attorney's request. In this context, Mother has not preserved her arguments for our review. *See In re G.X.H.*, 627 S.W.3d at 299 ("noting that "nothing in the record reflects the parents ever raised this complaint [about lack of section 263.401(b) findings] in the trial court" (citing Tex. R. App. P. 33.1)).

We further observe that the trial court expressly stated on the record during the June 15 hearing that "extraordinary circumstances" necessitated the extension, and the evidence before the trial court supports an implied finding of best interest. *See* Tex. Fam. Code § 262.201(b); *see also, e.g., R.C.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00687-CV, 2022 Tex. App. LEXIS 4213, at *21 (Tex. App.—Austin June 22, 2022, no pet. h.) (mem. op.) (noting that trial court already had found aggravated circumstances based on child's exposure to methamphetamine and citing section 153.002 of Family Code to support implied best interest finding by associate judge when associate judge's order made express finding of "extraordinary circumstances" with reference to pandemic); *D.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00454-CV, 2021 Tex. App. LEXIS 1565, at *25 (Tex. App.—Austin Mar. 3, 2021, no pet.) (mem. op.) (implying necessary findings to support trial court's denial of section 263.401 motion (citing *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 53 (Tex. 2003))). The trial court could have relied on the facts that Child was removed from the parents shortly after being born prematurely, testing positive for opiates, and showing symptoms of drug withdrawal; that the parents were not engaged in services, and Mother had not been drug testing since September 2020; and that at the time of the June 15 hearing, it appeared that the jury-trial setting the following week would not be reached, requiring an extension to avoid the

10

automatic dismissal of the Department's case and the return of Child to the parents when it appeared unsafe to do so. Mother's attorney also had represented to the trial court that she had begun drug treatment and hoped to provide a possible placement for Child. On this record, we overrule Mother's issue.[7]

**Foster Parents' Appeal**

In two issues, Foster Parents argue that the trial court erred in finding that the evidence was not legally and factually sufficient to support termination of Father's parental rights under section 161.001(b)(1)(O), *see* Tex. Fam. Code § 161.001(b)(1)(O), and that the evidence was legally and factually sufficient to support a conclusive finding that termination of Father's rights was in Child's best interest, *see id.* § 161.001(b)(2).

---

[7] As support for her position that the trial court lost jurisdiction, Mother cites *In re J.S.*, No. 05-21-00898-CV, 2022 Tex. App. LEXIS 1491 (Tex. App.—Dallas Mar. 3, 2022, pet. denied) (mem. op.). In that case, our sister court dismissed the Department's case because the trial court did not make a finding of extraordinary circumstances prior to the initial dismissal date, observing that the "supreme court has recognized only one situation in which the making of the [section 263.401(b)] findings may be *presumed*." *See id.* at *7 (emphasis added). But in that case, there is no analysis about implied findings that are supported by the record or the distinction between "best interest" and "extraordinary circumstances" inquiries. *Cf. D.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00454-CV, 2021 Tex. App. LEXIS 1565, at *25–27 (Tex. App.—Austin Mar. 3, 2021, no pet.) (mem. op.) (discussing what constitutes "extraordinary circumstances" and focus of "extraordinary circumstances" and "best interest" inquiries).

We also conclude that this Court's recent opinion in *S.W. v. Texas Department of Family. & Protective Services*, is factually distinguishable. *See* No. 03-22-00189-CV, 2022 Tex. App. LEXIS 6748 (Tex. App.—Austin Aug. 31, 2022, no pet. h.). In that case, the trial court did not expressly make an "extraordinary circumstances" finding at the hearing when it granted the extension, "there was no mention at the hearing of how the extension would serve the children's best interest," the permanency order following the hearing did not include the subsection (b) findings, and it did not involve a consolidated case with the foster parents who also were seeking termination and adoption. *Id.* at *7.

*Standard of Review*

"Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018); *see also In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022) ("A parent's fundamental right to the care, custody, and control of his child is of constitutional magnitude."). The trial court may order termination of the parent-child relationship if clear and convincing evidence supports that a parent engaged in one or more of the enumerated grounds for termination and that termination is in the best interest of the child. *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)); *see also A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). The clear and convincing evidence standard is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see also* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence"). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d at 630; *see also In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases").

In appeals involving the termination of parental rights, legal sufficiency review of the evidence requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re A.C.*, 560 S.W.3d at 630–

12

31. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* In reviewing the sufficiency of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *see also In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (noting that witness credibility issues that depend on appearance and demeanor "cannot be weighed by the appellate court; the witnesses are not present").

Because Foster Parents attack the legal sufficiency of an adverse finding on an issue on which they and the Department bore the burden of proof, they "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *In re Q.M.*, No. 02-19-00367-CV, 2020 Tex. App. LEXIS 1442, at *4–5 (Tex. App.—Fort Worth 2020, no pet.) (mem. op.) (citations omitted). In this context, we will sustain such a legal sufficiency challenge and reverse an adverse finding only if as a matter of law, the evidence conclusively establishes the "contrary proposition" to the finding. *Id.* (citing *In re M.I.A.*, 594 S.W.3d 595, 601 (Tex. App.—San Antonio 2019, no pet.)). "In other words, [the Foster Parents have to] conclusively establish that any reasonable trier of fact would have unavoidably formed a firm belief [of a predicate ground] and that termination was in the best interest of the child." *Id.* Further, for factual sufficiency review in this context, we review the entire record and determine whether the trial court's failure to form a firm conviction or belief that a parent's

13

rights must be terminated is "contrary to the overwhelming weight of the evidence and clearly wrong." *Id.*

*Best Interest*

Because it was Foster Parents and the Department's burden to prove both a predicate ground and that termination was in Child's best interest, we limit our analysis to the trial court's best interest finding as it is dispositive. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also, e.g., In re Q.M.*, 2020 Tex. App. LEXIS 1442, at *11 (affirming judgment that denied Department's petition to terminate parent's rights because Department only challenged statutory ground and not trial court's implied finding that termination was not in child's best interest, which finding by itself would "warrant a denial of termination").

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (citing Tex. Fam. Code § 153.131(b)). "And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to her minor child without clear and convincing evidence, 'the best interest standard does not permit termination merely because a child might be better off living elsewhere.'" *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied)). "Moreover, termination is not warranted 'without the most solid and substantial reasons.'" *Id.* (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of her child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence,

14

that the parent should no longer have any relationship with her child whatsoever." *Id.* (citing *In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.)).

When deciding the best interest of a child, factors that courts consider include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's conduct which may indicate that the existing parent-child relationship is not a proper one, and any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). This list of factors is not exhaustive, not all of them need to be proven to determine a child's best interest, and analysis of a single factor may be adequate in a particular factual situation. *See In re C.H.*, 89 S.W.3d at 27; *Holley*, 544 S.W.2d at 372.

Foster Parents argue that the evidence was legally and factually sufficient to support a conclusive finding that termination of Father's parental rights was in Child's best interest, and the Department agrees with them. The evidence was undisputed that Foster Parents were dedicated, bonded, loved, and had taken very good care of Child during his entire life, including ensuring that he received the necessary medical care and therapies that he needed. The evidence also showed that Father intentionally: (i) did not comply with court-ordered services, *see In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013) (explaining that "[m]any of the reasons supporting termination under subsection O also support the trial court's best interest finding" (citing *In re C.H.,* 89 S.W.3d at 28)); (ii) did not visit with Child for several months during the Department's case; (iii) did not disclose his home address to the Department during the case; and

15

(iv) left the hospital with Mother when she was in labor against medical advice. Foster Parents further characterize Father as having an unstable lifestyle and argue that Father showed bad judgment, that his decisions were not in Child's best interest, and that his refusal to drug test during the Department's case supports an inference of drug use. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (recognizing that fact finder could reasonably infer that parent's failure to complete scheduled screenings was because she was using drugs).

The trial court, however, did not place Child with Father but named him as a possessory conservator with only supervised visitation, expressly finding that appointing him as the permanent managing conservator would not be in Child's best interest because "the appointment would significantly impair the child's physical health or emotional development." *See* Tex. Fam. Code § 153.131(a); *see also In re J.A.J.*, 243 S.W.3d 611, 616–17 (Tex. 2007) (distinguishing proof required to support termination decision from proof required to support conservatorship appointment). In reaching its decision not to terminate Father's parental rights but to appoint him as a possessory conservator, the trial court found that the Department did not meet the heightened burden to prove, by clear and convincing evidence, that Father should no longer have any relationship with his child whatsoever, *see In re D.L.W.W.*, 617 S.W.3d at 81, but that the Department met its burden to prove by a preponderance of the evidence that Father's access and possession of Child should be limited, *see* Tex. Fam. Code § 105.005 (stating that generally trial court's findings should be based on preponderance of evidence); *In re J.A.J.*, 243 S.W.3d at 616 (stating that "finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard").

16

The Department argues that the trial court failed to adequately consider and weigh that denying Father's termination would result in Child being in long-term foster care. Foster Parents, however, were also appointed possessory conservators, and the evidence showed that the Department's plan for Child was for Foster Parents to continue to care for Child and that Foster Parents were willing to have a conservatorship relationship with Child in their home if parental rights were not terminated. Further, it was the role of the trial court to assess the witnesses' credibility and weigh the evidence of Father's lack of cooperation with the Department and his decisions surrounding Mother's pregnancy and birth with other evidence, including that Father had cared for his stepson and provided a stable home during the stepson's childhood and cared for Mother when he found out she was pregnant. *See In re A.B.*, 437 S.W.3d at 503 (deferring to decisions of "factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses"). The trial court could have found Father credible and believed his testimony about his actions after finding out Mother was pregnant, including taking her to rehab for her drug addiction and providing her with nutritious food, and after they left the hospital when Mother was in labor, including continuing to care for and monitor her and seeking medical assistance for her delivery. Father also was employed, and although Father did not stay in the same place, he identified a family home in Elgin and the hotel where he stayed and worked as a maintenance technician.

Applying the applicable standards of review, we conclude that the evidence was not legally or factually sufficient to support a conclusive finding that it was in Child's best interest to terminate Father's parental rights. *See In re Q.M.*, 2020 Tex. App. LEXIS 1442, at

*5–6; *In re M.I.A.*, 594 S.W.3d at 601–02.  Thus, we overrule Foster Parents' second issue and do not reach their first issue.  *See In re A.V.*, 113 S.W.3d at 362.

## CONCLUSION

For these reasons, we affirm the trial court's final decree of termination and orders for conservatorship, possession, and access.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed

Filed:  September 16, 2022